UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.  01-cr-263 (JBA) |
| | : | |
| v. | : | |
| | : | |
| JOSEPH P. GANIM | : | June 24, 2005 |

**RESPONSE TO DEFENDANT'S REQUEST FOR RE-SENTENCING**

The Government respectfully submits this memorandum in response to the defendant's request for re-sentencing on remand from the United States Court of Appeals for the Second Circuit pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).

**I.      Procedural History**

On March 19, 2003, the defendant was convicted of sixteen counts of racketeering, bribery, extortion, and tax fraud in the District of Connecticut.  This Court sentenced the defendant to a term of imprisonment of nine years, and entered judgment on July 14, 2003.  On July 17, 2003, the defendant filed a timely notice of appeal.  On April 26, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case, upon request of the Government and consent of the defendant, in light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).

On April 27, 2005, the Government moved for briefing on whether the Court would have imposed the same sentence if it had understood the law as subsequently explained by *Booker*. [Docket # 268.]  The defendant's response to that motion, filed May 6, 2005, argued that re-sentencing is warranted in this case.  *See* Defendant Ganim's Response to Motion for Post-

*Crosby* Proceedings on Remand (hereinafter "Defendant's Response" or "Def.'s Resp.") at 4-6. [Docket # 269.] In a scheduling conference on June 8, 2005, the Court granted the Government's motion. *See* Order (June 9, 2005). [Docket # 271.] Counsel for the defendant represented that the Defendant's Response contained the defendant's complete argument on the need for re-sentencing, and this Response therefore addresses the arguments for re-sentencing presented in the Defendant's Response.

## II.     Purpose of *Crosby* Remand

In *Booker*, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." *Id.* at 765-66.

In *Crosby*, the Court of Appeals determined that it would remand most pending appeals involving challenges to sentences imposed prior to *Booker* "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence." *Crosby*, 397 F.3d at 117. In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, *under the circumstances existing at the time of the original*

*sentence*, if the judge had discharged his or her obligations under the post-*Booker/Fanfan* regime and counsel had availed themselves of their new opportunities to present relevant considerations." *Id.* (emphasis added).

This statement of the purpose for *Crosby* remands makes clear that certain issues are simply irrelevant to this Court's determination on whether to re-sentence. Specifically, because this Court must determine whether to re-sentence based on "the circumstances existing at the time of the original sentence," *id.*, arguments relating to post-sentencing factors are irrelevant. Thus, while the defendant suggests that upon re-sentencing this Court should consider, *inter alia*, his rehabilitation since incarceration and the continuing impact of his incarceration on his family, *see* Def.'s Resp. at 5, those arguments -- which pertain to facts arising after his incarceration -- are not relevant to the Court's determination here of *whether* to re-sentence. The defendant apparently recognizes this limitation on the current proceedings because he notes that these arguments would be presented "should the Court order a *re-sentencing*." *Id.* at 5 (emphasis added).

**III.    Argument**

        **A.    The defendant presents no compelling reason to re-sentence in this case.**

                **1.    The defendant offers no reason for this Court to deviate from the Guidelines enhancements imposed in this case for the amount of loss and the defendant's leadership role.**

The defendant argues that this Court should re-sentence him because two Guidelines enhancements in his case (an eleven-point increase for amount of loss under U.S.S.G. § 2C1.1(b)(2)(A), and a four-point increase for his leadership role in the offense under U.S.S.G.

§ 3B1.1(a)) were "blunt" and "inflexible" determinants that caused a "dramatic increase" in his sentence. Def.'s Resp. at 4-5. This argument lacks merit.

Sentencing in the post-*Booker* regime, as explained in *Crosby*, now involves two analytic stages: first, a determination of the applicable Guidelines range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence. *Crosby*, 397 F.3d at 113. Thus, while a court may ultimately decide not to impose a Guidelines sentence, it must first determine the appropriate Guidelines range. *Id.*

At the original sentencing, this Court properly determined the appropriate Guidelines range for the defendant. The defendant contested both the applicability of the leadership role enhancement and the amount of loss attributed to him by the Probation Department in the Pre-Sentence Report ("PSR"). This Court carefully considered the defendant's arguments, ultimately concluding that the defendant was properly subject to the four-level enhancement for his leadership role in the offense and that he was responsible for a loss amount that was less than that calculated in the PSR, although more than the amount argued by the defendant. Although the defendant could have asked for a departure from the Guidelines range if he thought his case fell outside of the "heartland" of offenses covered by the calculated range, he did not do so. *See* 18 U.S.C. § 3553(b); *Koon v. United States*, 518 U.S. 81, 92-96 (1996); *see also* U.S.S.G. § 2F1.1, Application Note 11 (if amount of loss overstates seriousness of offense, a downward departure may be appropriate).

Now, in his request for re-sentencing, the defendant does not challenge the calculation of his Guidelines range. He makes no claim that he should have been eligible for a departure, that

the Court miscalculated his Guidelines, or that the Court should reconsider the applicability of the two enhancements. The defendant's only argument about his Guidelines range is that the enhancements for amount of loss and leadership role were unduly harsh and inflexible.

Far from being "blunt" or "inflexible," however, the Guidelines enhancements at issue both provide for graduated penalties to reflect nuanced differences in offense conduct. Thus, the enhancement in U.S.S.G. § 3B1.1 for aggravated role in the offense provides for enhancements of two, three, or four levels depending on the defendant's role (e.g., organizer/leader v. manager/supervisor) and the number of participants in the offense. *See* U.S.S.G. § 3B1.1(a)-(c). Similarly, the enhancement for amount of loss under U.S.S.G. § 2C1.1(b)(2)(A) provides a series of eighteen incremental enhancements tied specifically to the dollar amount of the loss. *See* U.S.S.G. §§ 2C1.1(b)(2)(A), 2F1.1(b)(1). In sum, although the defendant criticizes the amount of loss and leadership role enhancements as "stark" and "inflexible," those enhancements both establish a system of graduated penalties designed to tailor each sentence to the unique characteristics of the offense.

More fundamentally, the defendant's argument misunderstands the role of the Guidelines. As every Supreme Court Justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g., Booker*, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base

punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at 789 (dissenting opinion of Scalia, J.) ("[t]he primary objective of the Act was to reduce sentencing disparity."). Thus, *every* defendant across the country who committed similar crimes and was therefore subject to the same enhancements for amount of loss and leadership role is subject to the same increases in his sentence. Understood from this perspective, the Guidelines enhancements established a reasonable -- not an inflexible or harsh -- punishment for the specific characteristics of the defendant's offense.

Aside from the defendant's argument that his Guidelines range was unduly harsh, his arguments for re-sentencing focus on "stage two" of post-*Booker* sentencing by arguing that the Court should impose a non-Guidelines sentence in light of two factors listed in 18 U.S.C. § 3553(a). Specifically, the defendant argues that consideration of his history and characteristics (§ 3553(a)(1)) and of the need to "avoid unwarranted sentence disparities" (§ 3553(a)(6)) justify a different sentence in this case. Def.'s Resp. at 5. As described below, however, neither of these factors supports re-sentencing in this case.

> **2.    The Court already considered -- and exercised its discretion to discount significantly -- the defendant's positive achievements as Mayor of Bridgeport.**

The defendant argues that re-sentencing is warranted because at his original sentencing, this Court failed to consider his positive achievements as Mayor of Bridgeport. Specifically, the defendant argues that while this Court declined to give his achievements as Mayor *any* weight in

his original sentencing, this Court would be *required* to consider those achievements under § 3553(a)(1). Def.'s Resp. at 5. This argument is based on a misreading of the record.

Although the defendant asserts that this Court may now consider his achievements as Mayor when those achievements were not previously relevant under the Guidelines, at sentencing, even before *Booker*, a defendant had the incentive and legal right to bring to the court's attention all facts that are germane to punishment. In other words, even under a mandatory Guidelines sentencing regime, a district court had virtually unlimited discretion as to the kind of information it could consider regarding a defendant's background, character and conduct for the purposes of determining an appropriate sentence. *See, e.g.,* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *United States v. Gonzalez-Huerta*, 403 F.3d 727, 735 (10th Cir. 2005) (en banc) (defendants, "even prior to *Booker*, had every reason to present mitigating sentencing factors to the district court"); U.S.S.G. § 1B1.4 (in determining sentence to impose within sentencing range or whether departure is warranted, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law"). The Guidelines do provide that a variety of factors are not "ordinarily" relevant to *departures* from the sentencing range. *See, e.g.,* U.S.S.G. §§ 5H1.1-5H1.6. But the only factors said not to be "relevant in the determination of a sentence" at all are "race, sex, national origin, creed, religion, and socio-economic status," U.S.S.G. § 5H1.10, and that is a result of a direction from Congress, *see* 28 U.S.C. § 994(d).

And, indeed, consistent with this law, the defendant already presented his arguments about his background and positive achievements as Mayor to this Court in the original sentencing process. A substantial portion of the defendant's sentencing memorandum was dedicated to the defendant's personal history and characteristics (pages 13-20) and his achievements as Mayor for the City of Bridgeport (pages 20-33). Similarly, a substantial segment of defense counsel's comments at the sentencing hearing focused on these same arguments. *See* July 1, 2003 Sentencing Transcript ("Tr.") at 75-88, 91.

Further, the defendant's assertions notwithstanding, the record reflects that this Court carefully weighed all of the information available to it, including information concerning the defendant's background, character and conduct, prior to imposing sentence in this case. During the sentencing hearing, this Court indicated that it had considered the PSR and the defendant's sentencing memorandum, both of which describe the defendant's personal and professional background in great detail. *See* Tr. at 1-6, 101; PSR at ¶¶ 62-83. In addition, the Court indicated that it had read the many letters from community leaders, constituents and political supporters who had written to the Court urging leniency on the defendant's behalf. Tr. at 101. The Court also stated that it had taken into account the defendant's "energy, charisma, vision, communication and leadership skills," skills that he used "to move Bridgeport from the brink of bankruptcy into a forward motion," in fashioning an appropriate sentence. *Id.*

This Court ultimately decided -- as a proper exercise of its discretion -- not to give the defendant's achievements as Mayor any weight when fashioning the sentence in this case. *See id.* at 101-106. While the defendant seizes on this discretionary decision to support his claim that the Court failed to *consider* his positive achievements, as detailed above, this is a misreading of

the record. Moreover, there is nothing in the record to suggest that the Court was under the impression that it could *not* consider the defendant's achievements as Mayor. The fact that the Court elected not to weigh the defendant's positive achievements as Mayor against his record of corruption as Mayor does not mean that the Court failed to *consider* those positive achievements. As the Court fully explained, this decision reflected the Court's judgment that the defendant's job as Mayor was to achieve positive results for the City of Bridgeport:

> I've concluded that what Joseph Ganim did for the good of Bridgeport really is not to be considered as a factor in the sentencing of a corruption case because that's what a good mayor does. He has a vision, he campaigns on that vision, he uses his personal abilities and talents to persuade voters to use their one precious vote to put him in office so that he can make good on those promises, and the good ones deliver on their promises, or try hard to do that, and they care about all their citizens; they care about the homeless, they care about the affluent.
>
> So, it seems to me in consideration of what is the appropriate punishment for this pervasive and long scheme of corruption, not to consider and weigh and balance the achievements of the defendant as mayor: The simple reason is that we don't have a sliding scale for punishing corruption. There is no excuse for corruption from elected public officials. There is no exception for corruption for the good mayors. Theft of honest services is a crime because the fabric of the democratic process is a very fragile one. It needs constant attention and care. It cannot survive or be healthy if it is contaminated by corruption.

*Id.* at 101-02.

In sum, during the original sentencing in this case, this Court considered the defendant's positive achievements as Mayor, and therefore there is no need for re-sentencing to allow consideration of these achievements.

### 3. A Guidelines sentence provides the best mechanism for reducing *unwarranted* sentencing disparities and, in any event, the defendant has failed to identify similarly situated defendants who received materially different sentences.

The defendant suggests also that this Court should re-sentence him to take into consideration the need to reduce unwarranted sentencing disparities. Def.'s Resp. at 5, 6. This argument reflects a misunderstanding of the law, and is lacking in detail in any event.

Section 3553(a)(6) requires the court to consider, at sentencing, "the need to avoid *unwarranted* sentence disparities among defendants *with similar records who have been found guilty of similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). As the Court of Appeals has explained, the "unwarranted disparities" motivating this provision were *nationwide* disparities, not disparities between sentences imposed on co-defendants or two discrete cases. *See United States v. Joyner*, 924 F.2d 454, 460 (2d Cir. 1991) ("The Congressional objective was to eliminate unwarranted disparities nationwide."). The primary method for achieving the reduction in sentencing disparities was the enactment of the Guidelines system "that prescribes appropriate sentencing ranges for various combinations of facts concerning an offense and an offender and permits a sentencing judge to depart from the recommended range in unusual circumstances." *Id.*

While *Booker* eliminated the mandatory nature of the Guidelines system, the basic point remains that in the vast majority of cases, a sentence within the advisory Guidelines range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a)(6). As the Supreme Court emphasized in *Booker*, the "basic statutory goal" behind the Sentencing Guidelines was the reduction in sentencing disparities. 125 S. Ct. at

759. *See also id.* at 761 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); Tr. at 68 (counsel for defendant stating that "Congress has enacted the sentencing guidelines in part to create some sense of parody [*sic*] in sentencing, and as the Court is aware, throughout the country there were disparate results for similar crimes before Congress acted in 1986 and 1987."). Indeed, in most cases, the only way to avoid "gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines." *United States v. Wilson*, 355 F. Supp. 2d 1269, 1284 (D. Utah 2005) (quoting *United States v. Wilson*, 350 F. Supp. 2d 910, 924 (D. Utah 2005)).

Despite the evidence that Congress was concerned with nationwide sentencing disparities, and that a Guidelines sentence is the only practical way to achieve that goal, the defendant argues that this Court should re-sentence him because of unwarranted disparities between his sentence and the sentences of his co-defendants and other defendants convicted of similar conduct. Def.'s Resp. at 5, 6. But even if this Court could consider disparities between discrete cases in an effort to reduce unwarranted sentencing disparities, the defendant has identified no discrete cases for comparison, much less any discrete cases that create *unwarranted* disparities, that is, disparities "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

For example, without identifying specific cases or details, the defendant notes potential disparities between his sentence and the sentences imposed on his co-defendants, *see* Def.'s Resp. at 5, but as defense counsel effectively conceded during the original sentencing hearing, there were significant differences between the defendant and his co-defendants that warranted

11

different sentences. Tr. at 67 (noting that some co-defendants pleaded guilty and thus received credit for acceptance of responsibility; some co-defendants engaged in charge bargaining in their plea agreements); *id.* at 67-68 (Pinto cooperated with the government and so received a further reduction in sentence). And even apart from these differences, as this Court found, the defendant was not similarly situated to his co-defendants. He was the "key player" who "called the shots, held the cards and really was at the helm." *Id.* at 60. Similarly, while the defendant identified the sentence of former Connecticut Governor John Rowland as an example of a disparate sentence in his filings with the Court of Appeals, former Governor Rowland was not similarly situated to the defendant. Rowland pleaded guilty, before indictment, to a one-count Information charging him with conspiring to commit honest services mail fraud and tax fraud, admitting that he received approximately $107,000 in gratuities and that he failed to report them as income. The defendant, by contrast, was found guilty by a jury after a six-week trial of sixteen counts of racketeering, bribery, extortion, and tax fraud, with a total loss in excess of $800,000. Further, unlike Rowland and his co-defendants, the defendant here took the stand at trial, and as this Court found, obstructed justice by repeatedly providing materially false testimony to the jury. *Id.* at 62-63. Even these cursory descriptions reveal that the defendant was not similarly situated, for sentencing purposes, to his co-defendants or former Governor Rowland.

    In sum, this Court should reject the defendant's invitation to re-sentence based on a need to reduce unwarranted sentencing disparities. The Guidelines sentence imposed by this Court fully accounts for the defendant's history and personal characteristics, and the characteristics of his offense conduct, and ensures that his sentence is similar to other similarly situated defendants across the country.

**B.     Under the *Booker* sentencing regime, the sentence imposed in this case was a reasonable and just sentence.**

Under the law as announced in *Booker* and *Crosby*, the defendant received a just and reasonable sentence. The Court sentenced the defendant in this case to a term of imprisonment within his Guidelines range. *See* 18 U.S.C. § 3553(a)(4) (court must consider the defendant's Guidelines range). As described above, the Court imposed this sentence only after considering the defendant's personal history and characteristics, and his positive achievements as Mayor of Bridgeport. *Id.* § 3553(a)(1) (court must consider "the history and characteristics of the defendant"). And as further described above, the Guidelines sentence ensured that the defendant received a term of imprisonment commensurate with other defendants, nationwide, who had similar records and committed similar offenses. *Id.* § 3553(a)(6) (court must consider need to avoid unwarranted sentence disparities).

Finally, the sentence imposed in this case was reasonable because it served several purposes of punishment as identified in § 3553(a). Specifically, the sentence in this case, a significant term at the top of the defendant's Guidelines range, reflected the "nature and circumstances of the offense," § 3553(a)(1), the need for the sentence to provide "adequate deterrence to criminal conduct," § 3553(a)(2)(B), and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A). The graft and dishonesty that were the hallmark of Bridgeport local government during the defendant's terms as Mayor constituted a severe betrayal of the public's trust and caused an erosion in the electorate's confidence in the decency and propriety of their

13

local government.  As this Court observed in the original sentencing, this erosion of the public trust is a significant and serious crime that threatens the very foundations of our democracy:

> When we have flagrant examples of widespread, purposeful corruption that extends to all the areas of an elected official's purview, and particularly where it taints exactly those projects and achievements that are held up as the good that public officials can do, it reinforces the view of those already cynics, and it creates more cynics, converts them to the view that politics is corrupt, and that corrosion is cause to decrease what we treasure as the democratic process, democracy. . . .
>
> That's why the systematic, pervasive corruption of governmental office which causes loss of public confidence in government is a terrible crime, . . .
>
> . . . [W]here there has been this pervasiveness, this perversity of seeking higher office while engaging in this criminal corrupt activity, being designated as one of 25 of the best mayors in the country while being on the take, and while developing the ethos of the hero of Bridgeport while feathering one's nest, his nest, while doing so, is the stuff that cynicism is made of, and it's painful for his family to have him convicted, it's painful for the city to have the rug pulled out from under it, it's painful for Connecticut to have to be such a focus of media attention, but worse than that, it is a crime; it is conduct that undermines what is the critical thing for all of us, and that is the health of our democracy.  It takes a lot to keep it going and not much to erode it.
>
> . . . If we're going to keep our own precious jewel going, if we are going to be the beacon for others, we cannot tolerate, we cannot have corruption, we cannot have a sliding scale that punishes those who are good but corrupt less than those that are not as successful and equally corrupt.

Tr. at 103-06.  In keeping with the destructive and serious nature of the offense, the need to provide deterrence, and the need to promote respect for the law and provide "just punishment" for the offense, this Court properly sentenced the defendant to a term at the top of his Guidelines range.  For all of these reasons, the sentence imposed in this case was a just and reasonable sentence.

**IV.** **Conclusion**

For the foregoing reasons, in conformity with the procedures outlined in *Crosby*, this Court should indicate, for the record, that after consideration of the defendant's Guidelines range and all of the factors listed in 18 U.S.C. § 3553(a), the defendant should not be re-sentenced.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


SANDRA S. GLOVER
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct24354
157 Church Street, 23rd Floor
New Haven, CT 06510
Tel.: (203) 821-3700
Fax: (203) 773-5378
Sandra.Glover@usdoj.gov

RONALD S. APTER
SPECIAL ASSISTANT U.S. ATTORNEY
Federal Bar No. ct05038
Vice President, Assistant General Counsel, and
Deputy Director of Compliance
The Hartford Financial Services Group, Inc.
Law Department HO-1-09
Hartford Plaza
Hartford, CT 06115
Tel.: (860) 547-2311
Fax.: (860) 757-6743
Ronald.Apter@thehartford.com

CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June, 2005, a true and correct copy of the foregoing Response was served by first-class mail and electronic mail upon defense counsel:

Richard T. Meehan, Jr.
Edward J. Gavin
Meehan, Meehan & Gavin
76 Lyon Terrace
Bridgeport, CT 06604
rtm@meehanlaw.com
ejg@meehanlaw.com

J. Bruce Maffeo
233 Broadway, Suite 2701
New York, NY 10279
JBM@MAFFEOLAW.COM

Peter Goldberger
Law Offices of Alan Ellis
50 Rittenhouse Place
Ardmore, PA 19003-2276
petergoldberger@veritzon.net

_____
Sandra S. Glover
Assistant U.S. Attorney