UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

JUL  1  S 15 PM '05

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:01CR263(JBA) |
| | : | |
| v. | : | |
| | : | |
| JOSEPH P. GANIM | : | July 1, 2005 |

### REPLY MEMORANDUM IN SUPPORT OF RE-SENTENCING

This memorandum is submitted in further support of defendant Joseph P. Ganim's

("Ganim") request for re-sentencing in light of the recent Supreme Court decision in *United*

*States v. Booker,* 543 U.S. __, 160 L.Ed. 2d 621, 125 S.Ct. 738 (2005), as explained and

implemented by the Second Circuit's subsequent decision in *United States v. Crosby,* 397 F.3d

103 (2d Cir. 2005), and in reply to the government's memorandum in opposition dated June 24,

2005 ("Gov't. Response"). As initially set out in Ganim's Response to the Government's

Motion for Post-*Crosby* Proceedings, Ganim contends that both the directive of the Second

Circuit and the particular circumstances of his sentencing support his request for a full re-

sentencing.

The Legal Task Before the Court

A fundamental point of disagreement between the government and defense remains the

scope and weight of factors to be considered by a sentencing court in the wake of the upheaval in

federal sentencing caused by the *Booker* decision. The Second Circuit's decision in *Crosby*

explicitly set out the principles that the district courts must now follow when sentencing a

defendant:[1]

---

[1] Without conceding the correctness of the procedure adopted by the Second Circuit, Ganim recognizes
that the *Crosby* decision is binding on the court at this time.

> First, the Guidelines are no longer mandatory.   Second, the sentencing judge must consider the Guidelines and all of the other factors listed in Section 3553(a).   Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of the applicable policy statements.   Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (1) to impose the sentence that would have been imposed under the Guidelines, i.e. a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.   Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Crosby*, 397 F.3d at 114.  Following these five principles is mandatory and failure of the district court to understand and/or abide by each of them is but one of many ways that the Second Circuit warned a sentence may be deemed "unreasonable" upon appellate review.  397 F.3d at 114-115.

Of critical importance here, the district court in post-*Booker* sentencing is no less obligated upon remand from the appellate court to follow and implement these five principles than at a first sentencing.  In *Crosby,* the Second Circuit established a "limited remand" procedure for those cases pending on direct review where sentences were imposed prior to the *Booker* decision.  397 F.3d at 117.  This kind of remand is "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine whether to resentence, *now fully informed of the new sentencing regime,* and if so, to resentence."  *Id* (emphasis added).   In short, the Second Circuit set up this limited remand to find out from the district court whether "a correct perception of the law [pursuant to *Booker*] would have produced a different sentence."  *Id.* at 118.   However, while the remand is limited in the sense that it does not necessarily mandate a full resentencing, this remand nonetheless

2

requires that the court engage in the same analysis, albeit hypothetically, required for any sentence imposed post-*Booker*. In order to determine whether the court *would have imposed* a nontrivially different sentence had the court understood and followed the *Booker* mandate at that time, of necessity, the court must engage in the analysis to answer the question.[2]

The preliminary analysis required of the sentencing court upon remand, therefore, is a difficult hypothetical. The court must determine what, if anything, it would have decided differently at the time of the original sentence if: (a) the court had considered all of the factors under section 3553(a) that now must be weighed in determining a sentence under *Booker*; (b) counsel had been able to make a full presentation of factual information related to these mandatory factors; and (c) the court had viewed the Guidelines calculation, once determinative of all aspects of sentencing, as nonbinding, and indeed as only one of several factors of equal weight to be considered.[3] In other words, this hypothetical must envision how the court might

---

[2] The *Crosby* decision states that the district judge need only determine that "the original sentence would have been nontrivially different" and "need not determine what that sentence would have been." 397 F.3d at 118, n.20. While the Second Circuit allows therefore that an exact number need not be decided, the rest of the opinion repeatedly emphasizes the importance of the sentencing court considering what a different sentence might have been "in full compliance with the now applicable requirements." *Id.* at 118. To address that issue would seem to demand at least some degree of specificity.

[3] Significantly, the government misconstrues the task before the Court at this stage, claiming that all that is necessary is to look first at the Guidelines range, and then to decide if "there is any reason to impose a non-Guidelines sentence." *See* Gov't. Response at 4. This rendition of the post-*Booker* sentencing process is flatly contradicted by *Crosby*. The *Crosby* decision lists the Guidelines range as only one of many factors to be "considered" by the sentencing court, and expressly declined to decide "what degree of consideration is required." *See* 397 F.3d at 112, 113 ("the sentencing judge will have the duty . . . to consider [the Guidelines] along with all of the other factors listed in section 3553(a)"). Moreover, the *Crosby* decision warned against fashioning any *per se* rules regarding the reasonableness of a sentence that fell within a Guidelines range, precisely because such a rule might "effectively re-institute mandatory adherence to the Guidelines." *Id.* at 115. As discussed in the earlier brief, this authority, along with the explicit statutory mandate of 3553(a), have led courts to conclude that the Guidelines are not entitled to any greater degree of weight than the remaining factors. *See Simon v. United States,* 2005 U.S.Dist. LEXIS 4551, at 11-12 (E.D.N.Y. March 17, 2005); *United States v. West,* 2005 U.S.Dist. LEXIS 1123, (S.D.N.Y. Jan. 27, 2005)(Sweet, J.); *see also United States v. Jaber,* 2005 U.S.Dist. LEXIS 4028, at *17 (D. Mass., Mar. 16, 2005)(Gertner, J.); *United States v. Ranum,* 2005 U.S.Dist. LEXIS 1138 at *2

have behaved differently had there been a different quantum of evidence considered by the court,

a different significance attributed to that evidence, and most importantly, a different process of

synthesizing that evidence.

How the Sentencing Process Would Have Differed

      1.    The History and Characteristics of the Defendant

      Ganim respectfully contends that the quantum of evidence available to the court at

sentencing, and, even more important, the proper relevance of such evidence to be argued by the

defense and considered by the court, would have been materially different under a post-*Booker*

paradigm. For example, it is now mandatory that the sentencing court consider "the nature and

circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C.

§3553(a)(1). As the Court is aware, this broad category was virtually excluded from

consideration under the Guidelines, except to the limited extent that some characteristics

generated the guideline range or were deemed to fall within a sanctioned "departure" under

extraordinary circumstances. *See generally* U.S.S.G. §5H1.1-12 (policy statements delineating

numerous "offender characteristics" as "not ordinarily relevant" to sentencing); *see Booker,* 125

S.Ct. at 751 (noting that under the Guidelines, departures are "unavailable in most" cases). In the

pre-*Booker* era, therefore, a sentencing court was not allowed to consider, *inter alia,* an

offender's age, employment record, family and/or community ties, public service and record of

prior good works, as relevant to sentencing. *Id.* Yet post-*Booker,* not only are these facts part

of the "history and characteristics of the defendant" that *must* be considered, they are to be

---

(E.D.Wis. Jan. 19, 2005)(Adelman, J.). *Cf. United States v. Wilson,*350 F.Supp. 2d 910, 2005 U.S.Dist.
LEXIS 744 (D. Utah, Jan. 13, 2005) *on reconsideration,* 355 F.Supp. 2d 1269.

4

considered "along with all the other factors" of Section 3553(a), no longer relegated to the

remote region that lay outside of the 'heartland' of the Guidelines.[4] 18 U.S.C. §3553(b)(1).

Moreover, the government fails to understand that while defense counsel presented the

Court at the original sentencing with information regarding Ganim's personal background that

would qualify as part of his "history and characteristics," that alone does not defeat the need for

resentencing. *See generally* Sentencing Transcript ("Tr.") at 64-93. Not only was the

presentation of such evidence necessarily limited by defense counsel and the Court's knowledge,

accurate at the time, of what could fairly be deemed relevant at sentencing pursuant to the

Guidelines, what the Court was permitted to do with such evidence was also necessarily limited

by the Guidelines. In other words, even though the Court had information regarding Ganim's

personal life and accomplishments, the particular weight that could be accorded these facts was

limited except to the extent that the narrow basis for a downward departure was found to apply.

In *Crosby*, the Second Circuit acknowledged the significance of this difference between

being aware of certain information now relevant to sentencing, and being free to accord it the

significance the Court deems appropriate. 397 F.3d at 118. Specifically, in discussing the need

for a remand even when the sentencing court had assigned an "alternative" sentence in

anticipation of the *Booker* decision, the Second Circuit explained:

> [T]hat alternative sentence is not necessarily the same one that the
> judge would have imposed *in compliance with the duty to consider
> all of the factors* listed in section 3553(a). In addition, such an
> alternative sentence is not necessarily the same one that the judge
> would have imposed after presentation by the Government of
> aggravating circumstances or by the defendant of mitigating

---

[4] The effect of this change is apparent as some sentencing courts have relied upon such previously-excluded facts in sentencing. *E.g. United States v. Carmona-Rodriguez,* 2005 U.S.Dist. LEXIS 6254 (S.D.N.Y. Apr. 11, 2005)(Sweet, J.)(post-*Booker*, imposing a non-Guidelines sentence in part due to judge's conclusion that offender's age of 55 rendered her a markedly lower risk for recidivism); *accord, e.g., United States v. Mellian,* 2005 WL 300073, *3 (N.D. Ind., February 3, 2005).

> circumstances *that existed at the time but were not available for consideration under the mandatory Guidelines regime.*

397 F.3d at 118 (emphasis added).  Further, the *Crosby* court noted that "[a]lthough the duty to comply with section 3553(a) existed prior to *Booker/Fanfan,* it is unlikely that a sentencing judge anticipating that decision would have anticipated the full import of the Remedy Opinion, and considered the section 3553(a) factors, including the Guidelines, with awareness of the excision of subsection 3553(b)(1)." *Id.* at 118., n.18.

The government's efforts to understate the impact of *Booker* on this point have led it to the patently ludicrous assertion that under the Guidelines regime, "a district court had virtually unlimited discretion as to the kind of information it could consider regarding a defendant's background, character and conduct for the purposes of determining an appropriate sentence." Govt't. Response at 7 (quoting 18 U.S.C. §3661).  The reality of the binding effect of the Guidelines on the sentencing court's "virtually unlimited discretion" cannot be blinked away in this fashion.  As the *Crosby* court itself pointed out, it should not be underestimated how the sentencing court, even if aware of facts now deemed relevant for discretionary sentencing, might have considered and weighed them differently when freed from the mandatory strictures of the Guidelines.

Thus, in the hypothetical exercise of evaluating whether the sentence would have been materially different under a post-*Booker* sentencing framework, it is important to recognize as the *Crosby* decision did, that for more than a decade, judges have been required, in the vast majority of cases, virtually to *ignore* the exact same information that is now *required to be considered.*  Accordingly, because defense counsel was limited in his ability to argue the relevance to sentencing of facts regarding Ganim's personal life, upbringing, family circumstances, and accomplishments, and because the Court, upon hearing such information,

was not permitted to accord it more or less significance at its discretion, it cannot fairly be concluded that a sentence that could now encompass such factors would not have been materially different.

Indeed in this case, this point does not rest upon the purely hypothetical. The record indicates that the Court expressly declined to consider a factor at the original sentencing that is now subject to mandatory consideration. Specifically, the Court concluded that "what Joseph Ganim did for the good of Bridgeport really *is not to be considered as a factor* in the sentencing of a corruption case. . ." Tr. 101-102 (emphasis added).    While Ganim accepts that the Court's decision *not* to consider his accomplishments as mayor was fully within its discretion under the Guidelines-sentencing in place at the time of his original sentencing, the post-*Booker* sentencing now *requires* that the "history and characteristics" of the defendant form some part of the deliberative process at sentencing. *Crosby*, 397 F.3d at 118 (sentencing court now has "duty to consider all of the factors listed in section 3553(a)"). The previous decision by the Court to exclude this information from consideration underscores again the need for a full re-sentencing, not only to allow a complete presentation of relevant evidence, but also to permit the Court to engage in the proper process of considering all the relevant factors.[5]

2.    The Nature and Circumstances of the Offense

The Court is also now required to consider the "nature and circumstances of the offense" as a factor under Section 3553(a). *See* 18 U.S.C. § 3553(a)(1). Significantly, this factor stands separate and apart from that of the appropriate Guidelines range and any relevant policy statements issued by the United States Sentencing Commission. 18 U.S.C. § 3553(a)(4) and (5).

---

[5] Contrary to the government's claim, it would be inappropriate to gloss over the decision of the Court not to "consider" Ganim's prior positive achievements as mayor, as adequate for post-*Booker* purposes. *See* Govt.'s Response at 9. A *bona fide* engagement in the hypothetical analysis before the Court at the present time to weigh each factor under Section 3553(a) independently, is qualitatively different from the earlier decision rendered in the context of the binding application of the Guidelines.

In other words, although the courts have for years been accustomed to rely exclusively upon the tabulations of the Guidelines to determine the relative severity of the offense ("guideline offense level"), adjusted up or down for a variety of reasons, such as defendant's role both in the offense or during the investigation and prosecution of the offense, (*i.e.* § 3B1.1 -.5; 3C1.1-.2), the post-*Booker* regime affords the sentencing court the opportunity *separately* to consider the circumstances of the offense.

This distinction is critical where, as here, the Guidelines' assessment of the nature of the offense was particularly mechanistic due to the rigidity of loss determination and applicable "enhancements." For example, the offense level under the Guidelines in Ganim's case began at level 10 under § 2C1.1(a)(1), increased to 12 for "numerous bribes" pursuant to § 2C1.1(b)(1), and then almost doubled another 11 levels based on a finding that there was over $800,000 in benefits received that could be seen as reasonable foreseeable jointly-undertaken criminal activity. *See* Tr. at 5, 57-58. The offense level was then further increased another four levels based on the Court's assessment that Ganim qualified as a leader/organizer under § 3B1.1(a), and two more levels for obstruction of justice under § 3C1.1 based on Ganim's testimony at trial. Tr. at 58, 63. The final offense level of 29, with a criminal history category of I, put Ganim in the range of 87 to 108 months, and the Court opted to sentence him at the top of that range. Tr. at 64, 106.

The determination of monetary loss, recognized in *Crosby* as a "complicated matter," 397 F.3d at 112, was no less difficult to ascertain in this case. *See discussion* at Tr. 7-19, 57-58. Notwithstanding, the Court's finding on the amount of loss had enormous significance to Ganim's ultimate sentence due to the pre-set numbers in the loss table of the Guidelines. Similarly, while the government now minimizes it, the application of the leader/organizer

enhancement to the facts at trial was not clear-cut. *E.g.* Tr. at 58, 62 (recognizing that the unequal split of fees and the use of the terms 'partner' and 'friend' countered this finding; concluding that the evidence showed Ganim's "far greater culpability than Grimaldi *and perhaps equal culpability with Pinto*")(emphasis added). Yet again, despite some ambiguity, the impact of this finding was considerable, under the non-discretionary terms of the Guidelines. The Guidelines simply did not allow the kind of nuanced assessment that the Court's comment suggests. The cumulative effect of the enhancements for loss and leadership in this case, given the acknowledged difficulty in making these determinations, renders particularly important that under post-*Booker* sentencing, the Guidelines determination of the nature of the offense does not stand in isolation, but is balanced by the Court's own assessment, along with all of the other factors in Section 3553(a).[6] This opportunity to tailor a more nuanced and individualized sentence, which better reflects the factual findings by the Court regarding the nature of the offense, is therefore another reason to allow for a full re-sentencing in this matter.[7]

---

[6] Since *Booker*, many courts have suggested that the constitutional implications of Guideline sentencing, as recognized in Justice Stevens' majority opinion, may lead a court to apply a more stringent burden of the government's proof of sentence-enhancing facts, even when the resulting range is treated as "advisory." As the Tenth Circuit has suggested, the district court may now apply a burden of proof beyond a reasonable doubt, or at least a level of fact-skepticism beyond a bare preponderance. United States v. Dazey, 403 F.3d 1147, 1178 (10th Cir. 2005) ("strength of the evidence supporting Guidelines enhancements" may "now, in the discretion of the district court," be more relevant to sentencing decision). Many district judges have agreed with this analysis. See United States v. Kelley, 355 F.Supp.2d 1031 (D.Neb. 2005) (Bataillon, J.)[6]; United States v. Carvajal, 2005 WL 476125 (S.D.N.Y., 2/22/05) (Hellerstein, J.); United States v. Gray, 362 F.Supp.2d 714 (S.D.W.Va. 2005) (Goodwin, J.); United States v. Harper, 360 F.Supp.2d 833 (E.D.Tex. 2005) (Clark, J.); United States v. Pimental, 367 F.Supp.2d 143 (D.Mass. 2005) (Gertner, J.); United States v. Coleman, 2005 WL 1226622, *6-*7 (S.D.Oh., 5/24/05) (Marbley, J.). In light of the complexity of the loss calculations, for example, as well as the role question, just to give two example, this court might well have applied a heightened standard of proof, as suggested by these many other judges. For this reason as well, the result at a re-sentencing might be "non-trivially different," warranting a full re-sentencing under *Crosby*.

[7] In the continued attempt to trivialize the significance of the *Booker* changes, the government argues that the Court's decisions at the original sentencing as to the amount of loss and other enhancements under the Guidelines should be sufficient substitutes for the 3553(a) analysis. *See* Gov't. Response at 3-5. The point is, however, that the sentencing court is now no longer bound to accept the formula designed by the Guidelines to transform the particular offense conduct into an appropriate sentence, a freedom that is particularly significant where, as here, the sentencing court is intimately familiar with the facts from presiding over the trial and thus well-equipped to make its own determination. Further, it is disingenuous

3.    Subsequent Events

As the Court no doubt anticipates, the factual presentation at a re-sentencing would also be significantly different due to the intervening events since Ganim's original sentence: specifically, his extensive and successful efforts at rehabilitation during his incarceration, the continuing hardship endured by his family, and his opportunity to have reflected on the conduct that led to his conviction. There can be little doubt that this information would be required to be considered at a full re-sentencing as relevant to the Section 3553(a) factors. *See United States v. Quintieri,* 306 F.3d 1217 (2d Cir. 2002)(holding that even under a limited remand, "an issue may be raised if it arises as a result of events that occur after the original sentence" or for "cogent or compelling reasons" such as an intervening change in law, availability of new evidence or the need to correct clear error or prevent manifest injustice); *United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000)(extraordinary rehabilitation between first and second sentencing cannot be ruled out as possible ground for downward departure during second sentencing); *Werber v. United States,* 149 F.3d 172 (2d Cir. 1998)(holding that after a sentence is vacated pursuant to a §2255 motion "district court is required to resentence [the defendant] in light of the circumstances as they stood at the time of his resentencing"). Although the *Crosby* court declined to decide the issue of what "current circumstances" would be considered at a re-sentencing, 397 F.3d at 118, n.19, the decision specifically cites to *Quintieri* and *Werber,* strongly suggesting therefore, that upon a full resentencing, the Second Circuit would uphold "the general admonition that a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Quintieri,* 306 F.3d at 1230.

---

for the government to chide the defense for not requesting a guidelines departure, *see* Gov't. Response at 4, where the government is only too familiar with the rarity of such exceptions under the Guidelines regime, the narrow grounds that were available, and the heavy burden of justification.

Moreover, the government's response overlooks a recent opinion from a respected district court in this circuit finding that the later events eligible to be considered at re-sentencing, to the extent already known, must also play a part in the decision whether to re-sentence the defendant, thereby qualifying the purported limitation on a *Crosby* remand to "the circumstances that existed at the time of the original sentence." 397 F.3d at 118, n.19.  In *United States v. Murray*, 2005 U.S.Dist. LEXIS 9649, *12-14 (S.D.N.Y. May 23, 2005)(Baer, J.), the defendant had provided significant cooperation to the government *after* his original sentence and also acknowledged his earlier lies to the government about his own criminal acts.  The district court found these subsequent events to be highly significant under the Section 3553 factors.  *Id.* at *14. Since this information necessarily informed the court on what the appropriate sentence would be under the requisite post-*Booker* analysis, and *Booker* clearly gave the district court authority to find facts to determine an appropriate sentence, the district court concluded that the determination to re-sentence could be based on what happened both before and, in this way, after the original sentence.  *Id.* at *12-13.

The *Murray* decision correctly recognizes that the limited remand envisioned by *Crosby* cannot be rigidly applied.   To look in hindsight as to whether the sentence would have been different *if* the court had not been handcuffed to the Guidelines range and *if* counsel had been able to present all relevant information to the court and *if* the court had fully considered all that information under the separate factors of Section 3553(a), *all the while* keeping blinders on as to events transpiring since the original sentence that may have great impact to the ultimate sentence *should the re-sentencing be ordered,* requires a mental contortion inconsistent with the weighty task before the sentencing court, and misconstrues the spirit of *Booker,* as reflected in *Crosby,* in envisioning a more individualized sentencing procedure.

The importance of events occurring after the original sentence is even more critical to the Court's consideration here, where in the almost two years that have elapsed since his incarceration, Ganim has been a model inmate who has amassed an unblemished disciplinary record and been actively involved in mentoring inmates to assist them in gaining employment after their release and tutoring others who are attempting to obtain their GED.  In addition, Ganim has been commended by the institution for his participation in a program where he and other inmates speak to youths who are at risk of being arrested regarding the consequences of conviction and incarceration.  Taken together, these experiences have provided Ganim with an opportunity to reflect on his own role in the events leading to his conviction and would play a prominent part at re-sentencing.

        4.    The Need to Avoid Unwarranted Disparity

Finally, the sentencing court is also required to consider as part of the sentencing process the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  While a significant aim of the Guidelines is to increase uniformity nationally, *see Booker*, 125 S.Ct. at 758 (recognizing same), the post-*Booker* sentencing regime now includes the need to reduce disparity as a separate factor to be considered and weighed under Section 3553(a).  Accordingly, like the nature of the offense, this factor is no longer the sole province of the Guidelines, but rather is counterbalanced by the Court's own assessment.

While at least one panel in this Circuit, in an unpublished decision, has held that sentencing disparity is to be measured by reference to similarly situated defendants nationwide.  *See United States v. Toohey,* 2005 U.S. App. LEXIS 9437, *9  (2d Cir. May 23, 2005)(non-precedential), a preliminary review of nationwide statistics on sentencing reveals that the term of

12

incarceration Ganim received is significantly higher than the national average for defendants convicted of similar offenses. *See* United States Sentencing Commission's Sourcebook of Federal Sentencing Statistics (2003); United States Sentencing Commission Special Post-Booker Coding Project, dated May 5, 2005. For instance, the average term of imprisonment for all offenders convicted under bribery as a primary offense category in 2003 was 9.7 months, while those falling only under the criminal history category of I received an average of 15.2 months imprisonment. *See* Sourcebook, Table 13-14 (attached hereto as Exhibit A). Furthermore, of those offenders sentenced for a bribery conviction under the post-*Booker* regime, the average term of imprisonment was 14.3 months. *See* Coding Project (attached hereto as Exhibit B). While Ganim recognizes the limitations inherent in these rough comparisons, it is nonetheless significant that the federal government's data supports a finding that Ganim's term of incarceration was dramatically higher than the average for offenders in his same category. This indication of significant disparity is yet another reason for the Court to grant Ganim's request for a full re-sentencing, at which defense counsel would be able to present more detailed information on this point and the Court would be able to engage in the appropriate consideration of this factor pursuant to the *Booker-Crosby* mandate.[8]

---

[8] The government's attempt to distinguish the sentence imposed on former Connecticut Governor John Rowland is specious. Rowland was charged under the same theory used in the mail fraud charges contained in Ganim's indictment: deprivation of honest services. As the Court is aware, the government's theory of mail fraud later was narrowed to evidence establishing bribery or extortion but only after extensive motion practice before trial. *See United States v. Ganim,* 2002 WL 31780856 (D. Conn. Dec. 12, 2002). Moreover, the allegations regarding the scale and type of benefits bestowed on Ganim personally – as opposed to his codefendants - are comparable to those admitted to by Rowland in his plea as is the abuse of the respective government offices by the elected officials and their co-conspirators. *See* Government's Sentencing Memorandum in *United States v. Rowland,* Case 3:04-cr-00367-PCD, at 4 ("Rowland admitted as part of his guilty plea that he accepted illegal gratuities from Tomasso and related Tomasso entities as well as a company identified in the Information as Entity A in connection with the business of the State of Connecticut. The former Governor further admitted that he failed to report those more than $107,000 in illegal gratuities as income to the IRS."); indictment in *United States v. Peter N. Ellef, et al.,* (charging the Office of the Governor as the racketeering enterprise.) The only salient difference between the two cases is that Rowland pleaded guilty before indictment and Ganim did not.

## CONCLUSION

In sum, had the defense counsel been free to present all the evidence currently relevant to sentencing under section 3553(a), had the Court not been constrained by the rigid structure of the Guidelines in how to consider such evidence, and had the Court considered, as it now must, the specific factors set forth in section 3553(a), Ganim contends that his sentence would have been materially different from the 108 months imposed. Accordingly, Ganim respectfully requests that the Court order a full re-sentencing, and permit defense counsel and the government a further opportunity to present relevant evidence to the Court.

Dated: New York, New York
     July 1, 2005

Respectfully submitted,

BY:                               
RICHARD T. MEEHAN, JR., ct06029
MEEHAN, MEEHAN & GAVIN
Attorneys for Defendant
Joseph P. Ganim
76 Lyon Terrace
Bridgeport, Connecticut 06604
(203) 333-1888

BY:                               
J. BRUCE MAFFEO, ct23157
Attorney for Defendant
Joseph P. Ganim
233 Broadway, Suite 2701
New York, New York 10279
(212) 404-7040

  *-Of Counsel-*
Peter Goldberger, Esq.

---

That fact, while significant, should not obfuscate the clear parallels between the underlying criminal conduct in the two cases; nor could that factor alone account for the gap between their sentences.

14

## CERTIFICATE OF SERVICE

On July 1, 2005, I served a copy of the foregoing document on counsel for the government by United States mail, first class postage prepaid, addressed to:

Sandra S. Glover, Esq.
Assistant United States Attorney
U.S. Attorney's Office
District of Connecticut
P.O. Box 1824
New Haven, CT  06508

Ronald S. Apter, Esq.
Special Assistant U.S. Attorney
The Hartford Financial Services Group, Inc.
Law Depart. HO-1-09
Hartford, CT  06615

_____
J. BRUCE MAFFEO, ESQ.
Attorney at Law

EXHIBIT A

**Table 13**

**AVERAGE SENTENCE LENGTH IN EACH PRIMARY OFFENSE CATEGORY[1]**
**Fiscal Year 2003**

| PRIMARY OFFENSE | Mean Months | Median Months | Number |
|---|---|---|---|
| TOTAL | 47.9 | 24.0 | 69,322 |
| Murder | 247.5 | 180.0 | 80 |
| Manslaughter | 33.0 | 21.0 | 48 |
| Kidnapping/Hostage Taking | 160.1 | 120.0 | 59 |
| Sexual Abuse | 73.0 | 41.0 | 271 |
| Assault | 30.4 | 15.0 | 541 |
| Robbery | 101.7 | 71.0 | 1,532 |
| Arson | 87.2 | 60.0 | 82 |
| Drugs – Trafficking | 76.9 | 57.0 | 24,791 |
| Drugs – Communication Facility | 40.8 | 48.0 | 391 |
| Drugs – Simple Possession | 4.7 | 2.0 | 1,211 |
| Firearms | 70.0 | 43.0 | 6,766 |
| Burglary/B&E | 24.7 | 24.0 | 51 |
| Auto Theft | 60.8 | 21.0 | 142 |
| Larceny | 8.3 | 4.0 | 2,356 |
| Fraud | 14.4 | 8.0 | 7,429 |
| Embezzlement | 6.5 | 3.0 | 760 |
| Forgery/Counterfeiting | 12.7 | 9.0 | 1,262 |
| Bribery | 9.7 | 6.0 | 169 |
| Tax | 12.3 | 8.0 | 485 |
| Money Laundering | 45.3 | 24.0 | 826 |
| Racketeering/Extortion | 71.6 | 40.0 | 816 |
| Gambling/Lottery | 6.8 | 6.0 | 90 |
| Civil Rights | 39.4 | 13.5 | 66 |
| Immigration | 22.6 | 18.0 | 14,959 |
| Pornography/Prostitution | 63.5 | 33.0 | 799 |
| Prison Offenses | 17.1 | 12.0 | 369 |
| Administration of Justice Offenses | 15.7 | 8.0 | 1,042 |
| Environmental/Wildlife | 4.9 | 0.0 | 143 |
| National Defense | 75.6 | 30.0 | 21 |
| Antitrust | 7.2 | 4.0 | 12 |
| Food & Drug | 13.0 | 0.0 | 78 |
| Other Miscellaneous Offenses | 7.2 | 0.0 | 1,675 |

[1] Of the 70,258 cases, 936 were excluded due to one or both of the following reasons: missing primary offense (578) or missing or indeterminable sentencing information (503). Sentences of probation only are included in this table as zero months of imprisonment. In addition, the information presented in this table includes time of confinement as defined in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2003 Datafile, USSCFY03

**Table 14**

## AVERAGE LENGTH OF IMPRISONMENT FOR OFFENDERS
## IN EACH CRIMINAL HISTORY CATEGORY BY PRIMARY OFFENSE CATEGORY[1]
### Fiscal Year 2003

| | TOTAL | | | CRIMINAL HISTORY CATEGORY | | | | | | | | |
| | | | | I | | | II | | | III | | |
| PRIMARY OFFENSE | Mean Mths | Median Mths | n | Mean Mths | Median Mths | n | Mean Mths | Median Mths | n | Mean Mths | Median Mths | n |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 56.8 | 33.0 | 57,661 | 41.7 | 24.0 | 24,941 | 49.2 | 30.0 | 6,917 | 54.9 | 34.0 | 9,716 |
| Murder | 246.2 | 180.0 | 78 | 234.3 | 165.5 | 40 | 215.5 | 125.0 | 11 | 267.8 | 235.0 | 13 |
| Manslaughter | 34.8 | 21.0 | 44 | 30.6 | 18.5 | 26 | 18.7 | 18.0 | 9 | 44.3 | 45.0 | 6 |
| Kidnapping/Hostage Taking | 166.2 | 121.0 | 56 | 151.3 | 97.0 | 32 | 198.3 | 146.5 | 8 | 136.9 | 136.5 | 10 |
| Sexual Abuse | 78.6 | 49.5 | 250 | 60.6 | 37.0 | 176 | 99.3 | 81.0 | 24 | 88.1 | 70.0 | 23 |
| Assault | 39.2 | 30.0 | 407 | 28.7 | 23.5 | 138 | 37.1 | 30.0 | 52 | 31.6 | 27.0 | 73 |
| Robbery | 103.0 | 72.0 | 1,497 | 68.0 | 46.0 | 412 | 79.8 | 60.0 | 165 | 77.6 | 63.0 | 251 |
| Arson | 96.2 | 60.0 | 74 | 72.7 | 46.0 | 41 | 90.1 | 60.0 | 11 | 133.3 | 60.0 | 6 |
| Drugs - Trafficking | 80.2 | 60.0 | 23,666 | 55.1 | 37.0 | 12,816 | 79.6 | 62.0 | 2,770 | 93.6 | 70.0 | 3,519 |
| Drugs - Communication Facility | 47.4 | 48.0 | 332 | 38.6 | 45.5 | 140 | 43.2 | 41.0 | 49 | 48.9 | 48.0 | 49 |
| Drugs - Simple Possession | 8.9 | 6.0 | 602 | 5.5 | 5.0 | 455 | 8.7 | 6.0 | 32 | 10.7 | 6.0 | 47 |
| Firearms | 76.0 | 46.0 | 6,159 | 52.0 | 24.0 | 1,113 | 46.3 | 27.0 | 671 | 50.0 | 35.5 | 1,220 |
| Burglary/B&E | 25.4 | 24.0 | 48 | 12.8 | 9.0 | 10 | 19.9 | 18.0 | 8 | 21.5 | 24.0 | 11 |
| Auto Theft | 73.0 | 27.0 | 117 | 32.2 | 18.0 | 41 | 79.6 | 13.0 | 7 | 91.3 | 42.0 | 21 |
| Larceny | 16.8 | 12.0 | 991 | 14.4 | 12.0 | 433 | 13.6 | 9.0 | 126 | 14.6 | 10.0 | 155 |
| Fraud | 20.7 | 15.0 | 4,661 | 19.0 | 12.0 | 2,758 | 17.6 | 12.0 | 488 | 18.3 | 14.0 | 553 |
| Embezzlement | 9.6 | 5.0 | 394 | 9.2 | 5.0 | 350 | 9.3 | 6.0 | 16 | 16.1 | 7.5 | 14 |
| Forgery/Counterfeiting | 17.9 | 15.0 | 824 | 13.2 | 12.0 | 254 | 12.5 | 11.2 | 94 | 15.3 | 15.0 | 152 |
| Bribery | 16.2 | 12.0 | 85 | 15.2 | 12.0 | 68 | -- | -- | 2 | 14.5 | 14.0 | 4 |
| Tax | 18.7 | 12.0 | 269 | 17.1 | 12.0 | 213 | 20.9 | 18.0 | 26 | 27.7 | 21.0 | 18 |
| Money Laundering | 54.7 | 33.0 | 672 | 48.4 | 33.0 | 515 | 50.0 | 35.5 | 62 | 46.6 | 37.0 | 47 |
| Racketeering/Extortion | 77.7 | 46.0 | 741 | 55.0 | 33.0 | 452 | 73.2 | 60.0 | 83 | 97.8 | 60.0 | 91 |
| Gambling/Lottery | 12.9 | 13.3 | 27 | 11.2 | 6.0 | 12 | 11.4 | 14.0 | 7 | 15.0 | 18.0 | 7 |
| Civil Rights | 57.1 | 24.0 | 44 | 57.7 | 21.0 | 30 | 49.0 | 29.0 | 4 | 30.0 | 24.0 | 4 |
| Immigration | 24.5 | 21.0 | 13,483 | 11.1 | 6.6 | 3,220 | 17.0 | 12.0 | 2,014 | 23.2 | 18.0 | 3,156 |
| Pornography/Prostitution | 69.1 | 37.0 | 727 | 63.4 | 33.0 | 570 | 77.3 | 46.0 | 63 | 78.1 | 57.0 | 49 |
| Prison Offenses | 18.1 | 14.0 | 341 | 16.0 | 12.0 | 15 | 22.3 | 10.0 | 3 | 10.0 | 7.0 | 67 |
| Administration of Justice Offenses | 25.0 | 15.1 | 608 | 20.1 | 15.0 | 355 | 18.8 | 16.0 | 65 | 28.1 | 16.0 | 89 |
| Environmental/Wildlife | 13.1 | 6.5 | 34 | 11.3 | 6.0 | 24 | 4.3 | 4.5 | 4 | 17.3 | 24.0 | 3 |
| National Defense | 81.5 | 30.0 | 18 | 81.2 | 30.0 | 13 | -- | -- | 1 | 47.0 | 33.0 | 3 |
| Antitrust | 12.8 | 10.0 | 5 | 7.0 | 7.0 | 4 | -- | -- | 0 | -- | -- | 0 |
| Food & Drug | 43.6 | 13.0 | 21 | 45.8 | 13.0 | 17 | -- | -- | 1 | 44.1 | 24.0 | 3 |
| Other Miscellaneous Offenses | 26.6 | 14.5 | 386 | 19.1 | 12.0 | 198 | 23.1 | 12.0 | 41 | 27.3 | 15.0 | 52 |

[1]Of the 70,258 cases, 10,134 with zero months of prison ordered were excluded. In addition, 2,463 cases were excluded due to one or more of the following reasons: missing primary offense category (571), missing criminal history category (1,830), or missing or indeterminable sentencing information (1,281). The information in this table does not include any time of confinement as defined in USSG §5C1.1. Descriptions of variables used in this table are provided in Appendix A.

Table 14 (cont.)

### CRIMINAL HISTORY CATEGORY

| PRIMARY OFFENSE | IV | | | V | | | VI (non-career offender) | | | VI (career offender)[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mean Mths | Median Mths | n | Mean Mths | Median Mths | n | Mean Mths | Median Mths | n | Mean Mths | Median Mths | n |
| TOTAL | 62.5 | 41.0 | 5,999 | 70.3 | 48.0 | 3,544 | 82.1 | 57.0 | 4,732 | 191.5 | 172.0 | 1,812 |
| Murder | 282.5 | 225.0 | 8 | -- | -- | 1 | -- | -- | 2 | 373.3 | 470.0 | 3 |
| Manslaughter | -- | -- | 1 | -- | -- | 1 | -- | -- | 1 | -- | -- | 0 |
| Kidnapping/Hostage Taking | -- | -- | 1 | -- | -- | 1 | 351.0 | 235.0 | 3 | -- | -- | 1 |
| Sexual Abuse | 118.6 | 126.0 | 11 | 152.8 | 135.5 | 10 | 272.5 | 274.0 | 4 | -- | -- | 2 |
| Assault | 42.4 | 36.0 | 41 | 61.9 | 33.0 | 24 | 37.9 | 27.0 | 43 | 80.6 | 66.5 | 36 |
| Robbery | 98.0 | 72.0 | 173 | 150.8 | 87.0 | 107 | 112.3 | 97.0 | 148 | 182.0 | 151.0 | 241 |
| Arson | 52.7 | 60.0 | 3 | 123.0 | 126.0 | 4 | 174.7 | 120.0 | 7 | -- | -- | 2 |
| Drugs - Trafficking | 111.6 | 87.0 | 1,581 | 118.9 | 98.0 | 814 | 139.8 | 120.0 | 860 | 189.8 | 186.5 | 1,306 |
| Drugs - Communication Facility | 54.3 | 48.0 | 31 | 55.6 | 48.0 | 16 | 69.4 | 60.0 | 28 | 68.2 | 48.0 | 19 |
| Drugs - Simple Possession | 22.6 | 6.2 | 30 | 37.9 | 12.0 | 15 | 25.4 | 12.0 | 21 | -- | -- | 2 |
| Firearms | 70.5 | 46.0 | 1,082 | 81.8 | 60.0 | 708 | 115.5 | 92.0 | 1,234 | 314.2 | 248.0 | 131 |
| Burglary/B&E | 31.7 | 30.0 | 6 | 40.6 | 46.0 | 5 | 34.1 | 37.0 | 7 | -- | -- | 1 |
| Auto Theft | 100.2 | 53.0 | 12 | 51.6 | 37.0 | 9 | 80.1 | 40.0 | 23 | 308.5 | 292.0 | 4 |
| Larceny | 14.4 | 12.0 | 93 | 26.3 | 21.0 | 62 | 27.2 | 20.0 | 119 | 65.3 | 77.0 | 3 |
| Fraud | 24.3 | 18.0 | 313 | 29.6 | 23.0 | 187 | 34.2 | 30.0 | 362 | -- | -- | 0 |
| Embezzlement | 10.5 | 9.0 | 6 | 19.7 | 9.0 | 3 | 18.2 | 12.0 | 5 | -- | -- | 0 |
| Forgery/Counterfeiting | 18.8 | 16.0 | 97 | 24.1 | 21.0 | 86 | 28.5 | 27.0 | 141 | -- | -- | 0 |
| Bribery | 16.9 | 17.0 | 8 | -- | -- | 2 | -- | -- | 1 | -- | -- | 0 |
| Tax | 25.3 | 25.0 | 6 | 35.3 | 36.0 | 4 | -- | -- | 2 | -- | -- | 0 |
| Money Laundering | 71.0 | 57.0 | 25 | 346.2 | 70.0 | 9 | 120.2 | 84.0 | 13 | -- | -- | 1 |
| Racketeering/Extortion | 107.1 | 78.0 | 41 | 116.8 | 81.0 | 24 | 201.9 | 147.0 | 34 | 228.5 | 163.0 | 16 |
| Gambling/Lottery | -- | -- | 0 | -- | -- | 0 | -- | -- | 1 | -- | -- | 0 |
| Civil Rights | -- | -- | 2 | -- | -- | 0 | 104.3 | 41.0 | 3 | -- | -- | 1 |
| Immigration | 31.9 | 24.0 | 2,244 | 39.2 | 30.0 | 1,343 | 42.2 | 33.0 | 1,506 | -- | -- | 0 |
| Pornography/Prostitution | 99.4 | 58.5 | 22 | 126.5 | 64.0 | 11 | 154.5 | 90.0 | 12 | -- | -- | 0 |
| Prison Offenses | 15.9 | 12.0 | 83 | 16.2 | 12.0 | 54 | 21.5 | 18.0 | 91 | 37.6 | 37.0 | 28 |
| Administration of Justice Offenses | 47.8 | 21.0 | 44 | 35.8 | 30.0 | 27 | 43.0 | 30.0 | 23 | 53.2 | 48.0 | 5 |
| Environmental/Wildlife | -- | -- | 1 | -- | -- | 0 | -- | -- | 2 | -- | -- | 0 |
| National Defense | -- | -- | 0 | -- | -- | 0 | -- | -- | 1 | -- | -- | 0 |
| Antitrust | -- | -- | 0 | -- | -- | 0 | -- | -- | 1 | -- | -- | 0 |
| Food & Drug | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 | -- | -- | 0 |
| Other Miscellaneous Offenses | 33.5 | 22.5 | 34 | 29.5 | 21.0 | 17 | 54.1 | 28.0 | 34 | 64.4 | 45.0 | 10 |

[2]Career offender information is based on the recommendation of the probation officer in the PSR, if information from the sentencing court was missing or unavailable. As a result, the number of career offenders represented here is higher than the number reported in Tables 20 and 22.

SOURCE: U.S. Sentencing Commission, 2003 Datafile, USSCFY03.

**EXHIBIT B**

# U.S. Sentencing Commission
# Special Post-Booker Coding Project



## Data Extraction Date:
## May 5, 2005

**May 23, 2005**

# AVERAGE SENTENCE LENGTH IN EACH PRIMARY OFFENSE CATEGORY[1]
## Special Post-Booker Coding Project (Data Extracted 05/05/05)

| PRIMARY OFFENSE | Mean Months | Median Months | Number |
|---|---|---|---|
| TOTAL | 52.5 | 30.0 | 14,932 |
| Murder | 138.1 | 115.0 | 15 |
| Manslaughter | 36.7 | 21.0 | 15 |
| Kidnapping/Hostage Taking | 303.0 | 292.0 | 10 |
| Sexual Abuse | 73.2 | 46.0 | 74 |
| Assault | 36.2 | 30.0 | 131 |
| Robbery | 102.9 | 77.0 | 306 |
| Arson | 50.9 | 60.0 | 10 |
| Drugs - Trafficking | 80.9 | 60.0 | 5,428 |
| Drugs - Communication Facility | 42.3 | 47.0 | 74 |
| Drugs - Simple Possession | 8.6 | 0.0 | 120 |
| Firearms | 72.6 | 46.0 | 1,885 |
| Burglary/B&E | 15.2 | 8.0 | 8 |
| Auto Theft | 59.6 | 19.0 | 23 |
| Larceny | 9.7 | 5.1 | 402 |
| Fraud | 16.7 | 10.0 | 1,334 |
| Embezzlement | 8.5 | 4.0 | 112 |
| Forgery/Counterfeiting | 17.4 | 12.0 | 194 |
| Bribery | 14.3 | 8.0 | 51 |
| Tax | 11.7 | 6.0 | 120 |
| Money Laundering | 36.1 | 19.0 | 182 |
| Racketeering/Extortion | 73.7 | 46.0 | 135 |
| Gambling/Lottery | 6.1 | 6.0 | 17 |
| Civil Rights | 25.5 | 6.0 | 13 |
| Immigration | 22.6 | 18.0 | 3,452 |
| Pornography/Prostitution | 77.2 | 60.0 | 249 |
| Prison Offenses | 18.8 | 12.5 | 80 |
| Administration of Justice Offenses | 18.1 | 8.0 | 204 |
| Environmental/Wildlife | 2.8 | 0.0 | 41 |
| National Defense | 14.8 | 13.0 | 3 |
| Antitrust | 17.3 | 12.0 | 3 |
| Food & Drug | 3.1 | 0.0 | 12 |
| Other Miscellaneous Offenses | 10.0 | 0.3 | 229 |

[1] Of the 14,992 cases, 60 were excluded due to missing or indeterminable sentencing information (60). Zero cases were excluded due to missing primary offense. Sentences of probation only are included in this table as zero months of imprisonment. In addition, the information presented in this table includes time of confinement as defined in USSG §5C1.1.

SOURCE: U.S. Sentencing Commission, Special Post-Booker Coding Project, BOOKER05 (data extracted May 5, 2005; table prepared May 23, 2005). Percents may not sum to 100 percent due to rounding.